# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FIREMAN'S FUND INSURANCE COMPANY** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER 08-4882**<br>**Ref: All Cases** |
| **SNEED'S SHIPBUILDING, INC., ET AL** | **SECTION "L" (4)** |

## ORDER & REASONS

Before the Court are two motions for summary judgment brought by consolidated declaratory Plaintiffs Fireman's Fund Insurance Company ("Fireman's") (Rec. Doc. 62) and Federal Insurance Company ("Federal"). For the following reasons, these motions are now GRANTED.

## I.     BACKGROUND

These consolidated declaratory judgment actions arise from construction of a dry dock by Sneed's Shipbuilding, Inc. ("Sneed") for Superior Shipyard and Fabrication, Inc. ("Superior"). The dry dock was allegedly not built in a workmanlike manner and litigation has ensued. In these actions, Sneed's insurers seek declaratory judgment that they are not liable to indemnify or defend Sneed for suit brought against it by Superior.

The disputes arising out of construction of the dry dock have been litigated in three different venues. First, the litigation was set off by Superior's petition in Louisiana state court against Sneed and its president Martin Sneed alleging (a) that the dry dock failed to meet contract specifications; (b) that Sneed had breached their warranty; and (c) that Superior was entitled to lost profits. Sneed thereafter requested defense and indemnity from Fireman's Fund

Insurance Co. ("Fireman's") pursuant to a builder's risk policy and from Federal Insurance Co. ("Federal") pursuant to a marine general liability policy. Both insurers denied coverage under the respective policies for the claims asserted by Superior relying on various exclusions contained therein. On February 7, 2008, the state court litigation was transferred to the 17th Judicial District Court for the Parish of Lafourche. On July 21, 2008, Superior amended its petition to add Fireman's and Federal as defendants pursuant to Louisiana's direct action statute. On June 22nd, 2009, the 17th Judicial District Court held that Superior's tort claims against Sneed had prescribed, and therefore the court dismissed Superior's direct claims against Fireman's and Federal with prejudice without deciding coverage. At oral argument, the parties stated that the 17th JDC action is completely resolved and that Superior and Sneed have settled their contract dispute.

Second, there are the two consolidated declaratory actions in this Court. On November 12, 2008, Fireman's filed suit in this Court seeking a declaratory judgment that there is no coverage under the policy. On November 18, 2008, Federal filed a similar declaratory judgment action. Jurisdiction of this Court is premised on federal maritime jurisdiction, or alternatively, diversity.[1] These cases were consolidated on December 12, 2008. On January 4, 2009, the Court denied a motion to dismiss for lack of subject matter jurisdiction but stayed the consolidated actions pending the August 10, 2010 trial date in the state court proceeding.

Third, there is a suit pending in Texas state court. On October 30, 2009, Sneed filed suit against Federal and Fireman's as well as their agents in Orange County, Texas, under the Texas Business & Commerce Code and the Texas Insurance Code for deceptive trade practices and

---

[1]On December 2, 2009, Federal was granted leave to amend their complaint to include diversity as an alternative grounds for jurisdiction.

fraud and misrepresentation arising out of the sale of the policies.

Fireman's and Federal moved in this Court to lift the stay based on developments in the Louisiana and Texas state court proceedings.  The Court lifted this stay on October 1, 2010 at a status conference, because it appeared that neither the stayed 17th JDC case nor the Texas state court case would decide the question of coverage under the terms of the policies.

**b.      The Original State Court Allegations and Summary Judgment Record**

Superior filed suit against Sneed and its president, Martin Sneed.  The petition alleged that the dry dock did not meet specifications because:

1. Many portions of the vessel were not properly welded, including, but not limited to, brackets, corners, and access ports;
2. There are numerous gouges at the bottom of the dry dock;
3. The Carboline coating system was improperly applied on both the interior and exterior of the dry dock causing rust, cracking, and peeling;
4. Dirt and sand were painted over thereby causing an unsafe and hazardous condition; and
5. Other deficiencies that shall be identified at the time of trial.

Superior alleged that these errors made the dry dock defective and breached Sneed's warranty of good workmanship.  Superior sought recovery under theories of breach of warranty and redhibition for its expenses, damages, lost profits and loss of income, as well as attorney's fees.

The parties have submitted little summary judgment evidence.  Fireman's provides  an excerpt from the deposition of Martin Sneed, president of Sneed, who testified that there was no collision, allision, or stranding of the dry dock while it was at the shipyard.

**II.     LAW & ANALYSIS**

**A.      Preliminary issues**

**1.      Stay**

Sneed urges that the Court should stay these consolidated cases again.  The Court has

previously lifted the stay and no facts have changed to warrant imposing the stay again. The 17th JDC case is completely resolved, including any appeals from orders in that case. The Texas state court case does not appear likely to resolve the questions of coverage under the policy. According to Sneed, the "fact issues pending in Texas will be regarding the statements/actions of [agents for the insurers] in the act of selling the insurance policies." (Rec. Doc. 74 at 4). Thus, there appears to be no good cause to defer ruling in these declaratory actions.

### 2.    Governing Law

The parties dispute whether the applicable law is Texas law or maritime law incorporating Texas law. Fireman's argues that the Court should look at the insurance policy, not the underlying contract or the nature of the object insured, to determine whether the policy is a maritime contract governed by maritime law. Fireman's urges that "it is well-settled that a marine insurance policy is a maritime contract with federal admiralty jurisdiction." *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 n.2 (5th Cir. 1991). It urges that its builder's risk policy for a dry dock is a marine insurance contract, even if it covers a construction project with non-maritime aspects. *Cf. Hunt Const. Group, Inc. v. Allianz Global Risks U.S. Ins. Co.*, 503 F.3d 632, 634 (7th Cir. 2007). Federal also argues that its marine general liability policy is a marine insurance contract governed by maritime law.

Sneed responds that the insured property was a dry dock, which is not a vessel, and that an insurance policy on a dry dock cannot be a marine insurance contract. Sneed argues that the Court must look to the interest insured, not just the policy itself, to determine if an insurance policy is a maritime contract. *See Royal Ins. Co. of Am. v. Pier 39 Ltd. P'ship*, 738 F.2d 1035, 1036-37 (9th Cir. 1984) (because dry dock and breakwater were stationary, they were not vessels and policy was not maritime contract).

-4-

In reply, Federal and Fireman's argue that under applicable Supreme Court precedent, the Court must look to "the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions."  *Norfolk S. Railway Co. v. Kirby*, 543 U.S. 14, 23-24 (2004).   Federal argues that given the nature of Sneed's business as a shipyard, the coverages in the policy for Ship Repairer Liability and Marine General Liability, that its policy is a marine insurance contract.  Fireman's argues that its policy covers vessels, including vessels undergoing sea trials, and is therefore sufficiently related to maritime transactions to qualify as a marine insurance contract.

Resolving the question is not critical to the outcome of these motions.  All parties agree that Texas law governs interpretation of these insurance policies, whether directly or incorporated through the maritime law.

**B.      Fireman's Fund: Builder's Risk Policy**

Fireman's moves for summary judgment, arguing that there is no coverage or duty to defend under its Builder's Risk policy.  The policy "insures against all risks of physical loss of or damage to the Vessel occurring during the currency of this Policy, except as hereinafter provided.  In the event that faulty design of any part or parts should cause physical loss of or damage to the Vessel, this insurance shall not cover the cost or expense of repairing, replacing or renewing such part or parts, nor any expenditure incurred by reason of betterment or alteration in design."  (Rec. Doc. 62-4 at 39).

This is standard policy language, and the Fifth Circuit has interpreted it in a factually similar case.  In *Trinity Industries, Inc. v. Insurance Company of North America*, a vessel builder made a mistake that resulted in a seven to twelve-inch twist in a hull.  916 F.2d 267, 268 (5th Cir. 1990).  The purchaser of the vessel was dissatisfied and obtained an arbitration award

against the builder for breach of a warranty of workmanlike performance.  The builder sought to recover the amount of that award from its insurer under its builder's risk policy, which contained coverage language identical  to the policy in this case.  The Fifth Circuit held that defective workmanship was not covered under the builder's risk policy, even though it was an all-risk policy.  *Id.* at 269-70.  The court distinguished between "the cost of replacing or repairing defective workmanship," which is not covered by the Builder's Risk policy, and the costs of "an accident caused by defective workmanship," such as an accidental collapse caused by a defective support, which is covered by the policy.  *See id.* at 270.  In the Fifth Circuit's words, "[t]he [policy] language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state."  *Id.* at 270-71.  The court held that other cases finding liability under a Builder's Risk policy did so only where defective workmanship "led to a discrete event that a reasonable person would call an accident." *Id.* at 270.[2]

Fireman's argues that, based on the language of the policy and the reasoning of the *Trinity* decision, Superior's contractual claims against Sneed for faulty workmanship are not covered by the policy.  Fireman's argues that any rust or gouges are simply faulty workmanship on the part of Sneed and not alleged to have been the result of a specific accident.  Additionally, Fireman's argues that rust is a process, not an accident that might be covered, and is just another element of Sneed's faulty workmanship and not a separate subsequent consequence.  Further,

---

[2]The Fifth Circuit also found no coverage because, even if the policy was intended to cover the costs to repair faulty workmanship, the builder had not filed a claim for the cost of repairing the hull twist, but rather the cost of the arbitration award against it; the court found no coverage in the policy for contractual liability, which was not "physical loss or damage."  *Id.* at 271.

Fireman's provides deposition testimony from the president of Sneed, who stated that there was no collision or allision that could have caused gouges on the dry dock, and therefore that the summary judgment record is devoid of any evidence of a discrete accident covered under the policy.  Finally, Fireman's argues that Sneed's liability to Superior arises solely out of its contract, and that the contractual liability is not a physical loss to the dry dock and is not covered, under the reasoning in *Trinity*.

Sneed argues that two instances of damage alleged in the Superior suit are covered by the policy or triggered a duty to defend.  First, Sneed argues that the Superior suit alleged gouges to the bottom of the dry dock, and that gouges can be caused by physical accidents.  However, the Superior petition simply alleged gouges as one example of many of faulty workmanship, not the result of any specific accident.  Nor does Sneed submit any summary judgment evidence to contradict the deposition testimony of its president that no physical accident occurred; accordingly, there is no evidence that the gouges are the result of a covered event, nor did the allegations in the complaint allege a covered event.

Second, Sneed contends that the rust to the hull was not faulty workmanship in itself, but rather an accidental occurrence resulting from faulty workmanship; that is, because Sneed improperly applied a Carbolite coating to the dry dock, rust subsequently occurred in a separate accident.  The *Trinity* opinion leaves some room for this possibility, because it held that a separate accident caused by faulty workmanship would be covered under identical policy language.  However, the cases Sneed cites for the proposition that a defect in construction which damages another part of the same construction are distinguishable.  None of those cases dealt with the exact Builder's Risk policy language at issue in this case and interpreted in *Trinity*.  Furthermore, the Builder's Risk policy prohibits recovery of "the cost or expense of repairing,

replacing or renewing" "faulty design of any part or parts [that] cause physical loss of or damage to the Vessel."  In the cases Sneed cites, the insurance disputes dealt with subsequent damage to something that was not also the insured party's own product.  *Hauenstein v. Saint Paul-Mercury Indemnity Co.*, 65 N.W.2d 122 (Minn. 1954) (insured party supplied plaster which cracked and caused property damage to purchaser's building); *Pittsburgh Plate Glass Co. v. Fidelity & Cas. Co. of N.Y.*, 281 F.2d 538 (3rd Cir. 1960) (insured party supplied paint which peeled and caused property damage to purchaser's windows); *Bundy Tubing Co. v. Royal Indem. Co.*, 298 F.2d 151 (6th Cir. 1962) (insured party manufactured defective heating tubing which caused property damage to buildings in which it was installed).  Here, all of the alleged damage (gouges and rust) were damages to parts of the insured's own product, the dry dock.

The Fifth Circuit in *Trinity* interpreted identical policy language and held that it requires "an initial satisfactory state that was changed by some external event into an unsatisfactory state."  916 F.2d at 270-71.  The Superior petition alleged breach of the contract to build the dry dock in certain identifiable ways, including gouges and an improperly applied coating that led to rust.  Thus, the complaint is reasonably read as alleging that the dry dock was never in "an initial satisfactory state."  As delivered, the dry dock allegedly had gouges and was prone to rust. These were not the result of subsequent events, but defects inherent in the dry dock itself. Pursuant to *Trinity*, "neither party intended for the Builder's Risk policy to cover the cost of repairing [the builder's] mistakes in construction."  *Id.* at 269.  Accordingly, the Superior complaint triggered neither any duty to defend nor a duty to indemnify on the part of Fireman's. Fireman's motion for summary judgment is granted.

**C.  Federal: Marine General Liability Policy**

Federal also moves for summary judgment.  Federal insured Sneed under a marine

general liability policy.  Federal contends that the allegations of the Superior suit did not implicate coverage under the terms of the marine general liability policy and did not trigger a duty to defend Sneed.  Federal also argues that it have a duty to indemnify Sneed for damages to the dry dock or for the settlement with Superior.

### 1.   Duty to Defend

Under Texas law, whether a duty to defend under a general liability policy is triggered is determined by looking solely to the insurance policy and the lawsuit filed against the insured. *Standard Waste Systems Ltd. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 399 (5th Cir. 2010). Doubts must be resolved in favor of the insured, and if "*any* allegation in the complaint is *even potentially* covered by the policy then the insurer has a duty to defend its insured." *Id.* (quotation omitted and emphasis in original).  However, the court should not "read facts into the pleadings, look outside the pleadings, or imagine factual scenarios which might trigger coverage." *Id.* (quotation omitted).

The insured has the burden of proving coverage under the terms of the policy; if the insured proves coverage, the burden is on the insurer to show that the loss is within an exclusion in the policy.  *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008).

### 2.   Policy Terms

#### a.   Property damage coverage

The coverage language in the Federal policy is as follows:

The Company will pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay as damages because of:
Coverage A - Bodily Injury[3]
Coverage B - Property Damage

---

[3]The bodily injury coverage is not implicated in this case.

to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Assured seeking damages even if any of the allegations of the suit are groundless, false or fraudulent....

(Rec. Doc. 68-2 at 10).  "Property Damage" is defined as:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

(Rec. Doc. 68-2 at 7).  An "occurrence" is defined as:

an accident, including continuous or repeated exposure in conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured

*Id.*

Federal argues that the Superior petition did not allege anything constituting an "occurrence" or accident causing property damage, such that the duty to defend would be triggered.  Federal argues that the petition merely stated contractual and warranty claims that the dry dock as delivered did not meet specifications, and contained no factual allegations of any accident that caused the dry dock to fail to meet specifications.

Sneed again argues that either the rust or the gouges triggered coverage and Federal's duty to defend.  Sneed argues that the policy is at least ambiguous as to whether rust caused by faulty workmanship is an accident, because an occurrence is "an accident, including continuous or repeated exposure in conditions" that result in property damage.  Likewise, Sneed argues that the reference to "gouges" in the Superior petition necessarily implied some kind of potentially covered accident that caused those gouges.

The Texas Supreme Court has held that accidentally faulty workmanship that causes subsequent property damage can be an "occurrence" for the purposes of a general liability

-10-

policy.  *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8-11 (Tex. 2007).  But

often "faulty workmanship will be excluded from coverage by specific exclusions because that is

the CGL's structure."  *Id.* at 10.  The Superior petition alleged property damage to the dry dock

in the form of rust and gouges.  In light of the Texas Supreme Court's broad reading of

"occurrence" in *Lamar*, the allegation that the property damage resulted from faulty

workmanship falls within the coverage provision of the policy and is sufficient to trigger

coverage.  Thus, the next question is whether any exclusions apply.  Federal bears the burden on

this question.

**b.      Exclusions**

Federal argues for the applicability of numerous exclusions with respect to physical

damage and potential contract liability.  Specifically, Federal argues that a variety of general

exclusions apply to preclude any recovery for the physical damage to the dry dock; that the

Completed Operations Hazard also applies to restrict potential coverage; and that the Contractual

Liability Coverage does not apply.

**i.      General exclusions**

The policy includes a number of general exclusions for:

M.      loss of use of tangible property which has not been physically injured or
        destroyed resulting from:
    1.      a delay in or lack of performance by or on behalf of the Named
            Assured or [sic] any contract or agreement, or
    2.      the failure of the Named Assured's products or work performed by
            or on behalf of the Named Assured's products or work performed
            by or on behalf of the Named Assured to meet the level of
            performance, quality, fitness or durability warranted or represented
            by the Named Assured;
        but this exclusion does not apply to loss of use of other tangible property
        resulting from the sudden and accidental physical injury to or destruction
        of the Named Assured's products or work performed by or on behalf of
        the Named Assured after such products or work have been put to use by

-11-

any person or organization other than an Assured;

N.      property damage to the Named Assured's products arising out of such products or any part of such products;

.....

P.      to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the Named Assured's products or work completed by or for the Named Assured or of any property to which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(Rec. Doc. 68-2 at 12). Federal argues that these exclusions exclude broad swathes of Superior's alleged damages.

First, Federal argues that Exclusion N, for "property damage to the Named Assured's products arising out of such products," excludes coverage for economic loss arising out of the dry dock. Federal relies on *Zurich American Insurance Co. v. Nokia, Inc.*, in which the Texas Supreme Court enforced a similar "business risk exclusion" in a CGL policy to "preclude coverage for economic loss based on product defects." 268 S.W.3d 487, 500 & n.17 (Tex. 2008). Furthermore, Federal points out that general liability policies "are intended to provide coverage for tort liability, not for the contractual liability of the insured for loss which takes place due to the fact that the product or completed work was not that for which the other party had bargained." Lee R. Russ & Thomas F. Segalla, 9A *Couch on Insurance* § 129:16 (3rd ed. 2007). Thus, Federal argues that Exclusion N precludes recovery for the gouges or rust because Sneed's product was the dry dock and property damage to the dry dock arose (if at all) solely out of the dry dock itself or a component of the dry dock, such as the Carbolite coating.

In response, Sneed argues that Exclusion N does not apply to the alleged rust damage because that damage arises out of Sneed's negligence in applying the Carbolite, and not due to a product defect in the coating itself. However, Exclusion N excludes property damage to Sneed's

-12-

products or parts of its products.  Sneed's product was a dry dock, and the Carbolite coating was a part of the dry dock.  Sneed does not cite any authority regarding how Exclusion N should be interpreted.  But by the plain language of the Exclusion, the rust and gouges "arose out of" Sneed's product, the dry dock, and thus the Exclusion applies to exclude property damage to the dry dock itself.

Sneed also relies on a number of cases purportedly holding that defective installation which later causes damage is covered and not excluded under CGL policies, but those cases are distinguishable.  *E.g.*, *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864 (5th Cir. 2009) (interpreting similar CGL policy language and finding no exclusion where defective workmanship caused damage to property other than insured's own product); *Auto-Owners Ins. Co. v. Pozzi Window Co.*, 984 So.2d 1241 (Fla. 2008) (interpreting similar CGL policy language but finding exclusion did not apply because work was done by sub-contractor, which was excepted from exclusion).  None of these cases deal with identical exclusions or whether there is coverage when one aspect of an insured's unworkmanlike performance causes damage to another component of the same insured's own product.

On the other hand, Exclusion P does not seem to be implicated in this case.  Exclusion P is known as a "sistership" exclusion which "has been taken to mean simply that the insurer is not liable for cost of preventive or curative action taken by its insured in connection with the recall of products discovered to have a common fault."  *Lauren Plaza Ass., Ltd. v. Gordon H. Kolb Devs., Inc.*. 12 F.3d 208, 1993 WL 529909, at *4 (5th Cir. Dec. 2, 1993) (quotation omitted).  Exclusion P is not "intended to exclude from coverage damages arising from the malfunctioning of a product where no 'sister' products are involved."  *Todd Shipyards Corp. v. Turbine Svc.,*

*Inc.*, 674 F.2d 401, 419 (5th Cir. 1982).[4]  This case concerns only one dry dock and does not implicate Exclusion P.

Exclusion M also does not apply on its face to the allegations in the Superior petition. The petition alleges damages including "loss of income from removing the vessel from service" and "lost profits and damages sustained by Superior Shipyard in repairing the vessel at issue," due to the defects in the product.  Because the defects constituted property damage, and because Exclusion M only excludes loss of use damages not due to property damage, Exclusion M does not apply.  But, to the extent that the Superior petition alleged loss of use arising from property damage in the form of rust and gouges, Exclusion M excludes loss of use not arising from property damage.  Moreover, the carveout to Exclusion M does not apply, because the Superior petition alleged that the dry dock as constructed breached the warranty of workmanlike construction, and thus the property damage did not occur "after such products or work have been put to use by any person or organization other than an Assured."[5]

Although Exclusions M and P do not apply, for the reasons discussed above Exclusion N does apply based on the eight corners of the Superior petition and the policy.  Therefore, ederal had no duty to defend Sneed for the physical damage to the dry dock.

ii.      **Broad Form Property Damage and Completed Operations Hazard**

The policy also contains a Broad Form Property Damage Endorsement which states that

---

[4]*Lauren Plaza* and *Todd Shipyards* both applied Louisiana law, but Louisiana law and Texas law regarding sistership exclusions are consistent.  *See generally Gulf Ins. Co. v. Parker Prods., Inc.*, 498 S.W.2d 676, 678 (Tex. 1973).

[5]To the extent that the Superior petition is ambiguous as to whether rusting occurred before or after Superior put the dry dock to use, the duty to defend would not have been avoided by Exclusion M.

coverage does not extend:

> (3)    **with respect to the completed operations hazard** and with respect to any classification stated in the policy or in the Company's manual as "including completed operations", to **property damage to work performed by the Named Assured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith**.

(Rec. Doc. 68-2 at 22).  The "completed operations hazard" is defined as follows:

> D.    "completed operations hazard" includes bodily injury and **property damage arising out of operations** or reliance upon a representation or warranty made at any time with respect thereto, but only **if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented by the Named Assured**.  "Operations" include materials, part or equipment furnished in connection therewith.  Operations shall be deemed completed at the earliest of the following times:
>
> 1.    when all operations to be performed by or on behalf of the Named Assured under the contract have been completed.
> 2.    when all operations to be performed by or on behalf of the Named Assured at the site of the operations have been completed, or
> 3.    when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
>
> Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed;

(Rec. Doc. 68-2 at 5).  Thus, the "broad form property damage" endorsement excludes coverage for property damage arising out of the insured's work after the work has been completed.  On that basis, Federal argues that, if the Superior complaint alleged property damage caused by an occurrence, any such claims were excluded by these policy exclusions.

In opposition, Sneed argues that because "completed operations hazard" is defined to include property damage occurring after completion of operations and away from the insured's premises, there must be coverage.  However, the "completed operations hazard" seems to be a

-15-

definition, not a grant of coverage, and exclusion (3) in the broad form property damage endorsement excludes damages for completed operations that consists of "property damage to work performed by the named Assured arising out of such work ... or out of such materials, parts or equipment furnished in connection therewith." The case Sneed relies on, *Kalchthaler v. Keller Const. Co.*, 591 N.W.2d 169 (Wis. App. 1999), interprets different policy language and is not apposite. Thus, for the same reason Exclusion N applies, the Broad Form Property Damage Endorsement excludes coverage for Completed Operations Hazards, and no duty to defend arose on the basis of that policy language.

**c.      Contractual Liability coverage and exclusions**

The parties also dispute whether Sneed's contractual liability to Superior for breach of the contract to build the dry dock is covered by the policy. The policy does not affirmatively set forth coverage for contractual liability. Rather, coverage for potential contractual liability exists if the liability falls within the general coverage provision, as altered by a Contractual Liability Coverage endorsement. As noted above, the policy covers "sums which the Assured shall become legally obligated to pay as damages because of ... Property Damage to which this insurance applies, caused by an occurrence." Exclusion A excludes:

> liability assumed by the Assured under any contract or agreement except an incidental contract, but this exclusion does not apply to a warranty of fitness or quality of the Named Assured's products or a warranty that work performed by or on behalf of the Named Assured will be done in a workmanlike manner.

(Rec. Doc. 68-2 at 10). A separate section of the policy, entitled "Marine General Liability Additional Coverages," contains a subsection entitled "Contractual Liability Coverage." Section A of the "Contractual Liability Coverage" extends the definition of "incidental contract" to include, as relevant here, "any oral or written contract or agreement relating to the conduct of the

-16-

Named Assured's business."  (Rec. Doc. 68-2 at 16).  Additionally, the Contractual Liability Coverage endorsement renders some other exclusions inapplicable to contractual liability, but does not affect the aforementioned Exclusions M, N, or P.  *Id.*  In one sense this endorsement "creates" contractual liability coverage, because it broadens the scope of the incidental contract exception to Exclusion A, and thus brings additional contractual claims back within the scope of coverage.  However, any expanded contractual liability coverage must still be for a sum owed due to covered property damage (or personal injury).  Read as a whole, contractual liability is covered under the policy only if it is an amount Sneed must pay because of property damage, and if it is liability assumed on any contract or agreement that relates to the conduct of Sneed's business or if it is based on a warranty of fitness, quality, or workmanlike work.

Sneed emphasizes the portion of Exclusion A which states that "this exclusion does not apply to a warranty of fitness or quality of the Named Assured's products or a warranty that work performed by or on behalf of the Named Assured will be done in a workmanlike manner." However, whether an exclusion does not apply in a particular situation and whether that particular situation is affirmatively covered by the policy are two different questions.  If damages from a breach of warranty of fitness or workmanlike manner are not already covered by the policy, a carveout from an exclusion will not create coverage where none otherwise exists, as numerous courts have held in interpreting identical exclusions.  *See Travelers Ins. Co. v. Volentine*, 578 S.W.2d 501, 505 (Tex. App. 1979); *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 626-27 (9th Cir. 1996); *Essex Builders Group, Inc. v. Amerisure Ins. Co.*, 429 F. Supp. 2d 1274, 1278 (M.D. Fla. 2005).  Accordingly, Sneed's argument based on Section A fails.

There are two significant hurdles to finding any covered contractual liability in the claims

-17-

alleged in the Superior petition.  First, courts have interpreted "liability assumed by the insured" to mean only liability deriving from indemnification and hold-harmless agreements, and not from an insured's own liability for breach of a contract with a third party.  *E.g.*, *Ingalls Shipbuilding v. Fed. Ins. Co.*, 410 F.3d 214, 222 (5th Cir. 2005).  "The assumption by contract of the liability of another is distinct conceptually from the breach of one's contract with another." *Musgrove v. Southland Corp.*, 898 F.2d 1041, 1044 (5th Cir. 1990).  Thus, courts dismiss attempts by an insured to shoehorn its own breach of contract or warranty of workmanlike performance into contractual liability under a general liability policy.  *See Brookshire Bros. Holding, Inc. v. Total Containment, Inc.*, No. 04-1150, 2006 WL 3692770, at *6 (W.D. La. Dec. 11, 2006); *accord* 21-132 *Appleman on Insurance* § 132.3[C] ("[I]n the CGL policy and other liability policies an 'assumed' liability is generally understood and interpreted by the courts to mean the liability of a third party, which liability one 'assumes' in the sense that one agrees to indemnify or hold the other person harmless.'").  Thus, Sneed's own liability for breaching its own contract to build a dry dock is not intended to be covered by the policy.

Second, Exclusion N still applies to exclude coverage for sums Sneed's owes for property damage to the dry dock arising out of the dry dock or its components.  As described above, the alleged contractual damages in the Superior petition are squarely excluded by Exclusion N.  The Court cannot fathom how the actual damage to the dry dock arising out of defective workmanship would be excluded, but the liability Sneed's accrued for breaching a contract to deliver that dry dock in a non-defective state would somehow be covered.  Certainly, Sneed cites no authority for that proposition.

Sneed's other effort to find coverage triggered by the Superior petition is unavailing. Sneed argues that because Martin Sneed, the president of Sneed's Shipbuilding, was a Named

Assured under the policy and because Superior's suit named Martin Sneed individually, that

Martin Sneed had "assumed personal liability" for Sneed's Shipbuilding's performance of the

contract.  Therefore, Sneed argues that Martin Sneed's personal assumption of liability was an

"incidental contract" which is not excluded by Exclusion A, and is therefore within the 8 corners

of the policy and complaint and triggered Federal's duty to defend.  However, there is nothing in

the Superior complaint regarding an actual incidental contract in which Sneed assumed any such

liability; Martin Sneed was simply named as an additional defendant liable for the breach.

Indeed, Martin Sneed is alleged to have been a party to the contract to build the dry dock, not

any other contract whereby he assumed Sneed's Shipbuilding's liability.  Accordingly, based on

the eight corners of the petition and the policy, the analysis as to Sneed's Shipbuilding and

Martin Sneed is identical.

For the foregoing reasons, the Court concludes that summary judgment is appropriate and

that as a matter of law Federal owed Sneed no duty to defend against the Superior petition.

### 2.      Duty to Indemnify

The duty to indemnify concerns the actual facts of the claim rather than the allegations of

the third party's complaint.  *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740,

743 (Tex. 2009) (citation omitted).  "The insurer's duty to indemnify depends on the facts

proven and whether the damages caused by the actions or omissions are covered by the terms of

the policy."  *Id.* at 744.  The only amount that Sneed has had to pay to Superior is, evidently,

whatever amount was paid to settle the 17th JDC proceeding.  Federal argues that because the

tort claims against it  in the 17th JDC proceeding were dismissed as prescribed, the subsequent

settlement must have been for contractual damages, which it contends are not covered for the

reasons discussed above.  Federal also urges that summary judgment is appropriate on this issue

-19-

because there are no disputed factual issues related to the underlying claims by Superior.

Sneed asserts that the causation of gouges to the dry dock is genuinely disputed, but it has provided no summary judgment evidence to support that.  Sneed also asserts that whether the rust damage is separate from the cost of applying another coat of the Carboline coating is a factual issue; the Court disagrees and concludes that is a question of interpretation of coverage under the policy.

Although the parties' briefing on this point is sparse, the Court concludes that summary judgment on the question of the duty to indemnify is also appropriate.  In light of the proceedings in the 17th JDC, Superior's tort claims against Sneed were dismissed and any potential remaining liability logically was only for breach of contract which, as set forth above, is excluded under the policy.  Sneed has not come forward with any competent summary judgment evidence creating an issue of fact regarding amounts for which it seeks indemnity that might be covered under the policy.  Accordingly, applying the same interpretation of the policy set forth above in connection with Federal's duty to defend, the Court concludes that on these undisputed facts the policy unambiguously excludes coverage and that Federal has no duty to indemnify Sneed.

**IV.    CONCLUSION**

For the foregoing reasons, IT IS ORDERED that the motions for summary judgment filed by Fireman's Fund (Rec. Doc. 62) and Federal (Rec. Doc. 68) are GRANTED.  The Court will issue a separate declaratory judgment finding no duty on the part of either Plaintiff to defend or indemnify Sneed from the lawsuit filed by Superior.

New Orleans, Louisiana, this <u>22nd</u> day of March, 2011.

_____
UNITED STATES DISTRICT JUDGE